IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:22-CT-03020-M

| | | |
|---|---|---|
| MARKUS ODON McCORMICK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | ORDER |
| | ) | |
| SASHA GRAHAM, et al., | ) | |
| | ) | |
| Defendants. | ) | |

This cause is before the court on plaintiff's pending motions, see [D.E. 93, 95, 100], and defendants' motion for summary judgment, Mot. [D.E. 86]. These motions are ripe for review.

Relevant Procedural History:

On January 18, 2022, Markus Odon McCormick ("plaintiff" or "Marcus"), a state inmate proceeding *pro se* and without prepayment of fees, filed a complaint under 42 U.S.C. § 1983. [D.E. 1, 2, 7]. Plaintiff later moved to appoint counsel, Mot. [D.E. 9], to amend his complaint, Mot. [D.E. 10], "to include attachments," Mot. [D.E. 11], and to expedite [D.E. 12, 13].

On December 15, 2022, the court denied the motion to appoint counsel, granted the motions to amend or supplement, denied the motion to expedite, conducted its initial review, allowed the action to proceed against Fayetteville Police Department ("FPD") Officers Sasha Graham, Joshua Bass, and Kelton Glorafield (collectively, "defendants"), dismissed without prejudice the FPD and the City of Fayetteville as defendants, and issued summons. Order [D.E. 15]; [D.E. 16].

On December 28, 2022, plaintiff filed an interlocutory appeal. See [D.E. 17].

On December 29, 2022, summonses were returned executed. See [D.E. 21, 22, 23].

On January 3, 2023, plaintiff filed motions seeking "funds for private investigator [sic]," Mot. [D.E. 24], recusal of the undersigned judge, and appointment of counsel, see Mot. [D.E. 25].

On January 20, 2023, the court, *inter alia*, denied without prejudice the "motion for funds for private investigator for pro se plaintiff [sic]," denied the motion seeking recusal, denied without prejudice the motion to the extent plaintiff sought appointment of counsel, and directed defendants to answer or otherwise respond not later than February 13, 2023. Order [D.E. 28].

On January 26, 2023, plaintiff moved to amend his complaint. Mot. [D.E. 29]. Also on that date, the United States Court of Appeals for the Fourth Circuit granted plaintiff's motion to voluntarily dismiss his interlocutory appeal, Order [D.E. 30], and entered its mandate [D.E. 31].

On February 10, 2023, Graham, Bass, and Glorafield answered the complaint. [D.E. 36].

On February 15, 2023, the court: granted the motion to amend; conducted its initial review of the amended complaint; dismissed the new claims therein either for failure to state a claim under 28 U.S.C. § 1915A(b)(1), or as barred by Heck v. Humphrey, 512 U.S. 477 (1994) ("Heck"); dismissed without prejudice as defendants Everette Hockenberry, Gina V. Hawkins, Mike Hardin, six John Does, the FPD, and the City of Fayetteville; and referred the action to United States Magistrate Judge Robert B. Jones, Jr. for entry of a scheduling order. See Order [D.E. 37].

On February 16, 2023, Judge Jones entered a scheduling order that set a discovery deadline of May 17, 2023, and a dispositive motions deadline of June 16, 2023. Order [D.E. 38].

On February 27, 2023, plaintiff again moved to amend his complaint. Mot. [D.E. 40].

On March 10, 2023, plaintiff filed an interlocutory appeal as to the court's February 15, 2023, order. See [D.E. 44, 45].

On March 17, 2023, plaintiff moved for permission to depose witnesses. Mot. [D.E. 47].

2

On March 30, 2023, plaintiff moved to exceed the number of permissible interrogatories. Mot. [D.E. 53], and "for voluntary dismissal of amended complaint [sic]," Mot. [D.E. 54]. Also on that date, the court, *inter alia*: directed the clerk to seal various docket entries, denied without prejudice plaintiff's motion seeking to depose witnesses, denied in part plaintiff's motion to the extent he sought leave to serve additional interrogatories, but granted in part the motion to the extent plaintiff instead sought to strike interrogatories as to Graham and Glorafield, and directed plaintiff to inform the court whether he was seeking leave to amend the complaint or voluntary dismissal. See Order [D.E. 55].

On April 3, 2023, plaintiff moved for leave to amend the complaint. Mot. [D.E. 56].

On April 6, 2023, defendants moved for a protective order to stay discovery. See Mot. [D.E. 57]. The court granted this motion on April 7, 2023. Order [D.E. 60].

On April 20, 2023, plaintiff moved to seal his April 3, 2023, motion. See Mot. [D.E. 63].

On May 8, 2023, plaintiff moved to modify the protective order. Mot. [D.E. 65].

On May 15, 2023, the court, *inter alia*: denied as moot plaintiff's February 27, 2023, motion to amend the complaint; granted in part plaintiff's March 30, 2023, motion to the extent he sought leave to amend his complaint; granted plaintiff's April 20, 2023, motion to seal; allowed defendants to file a response and plaintiff to file a reply as to plaintiff's April 3, 2023, motion for leave to amend the complaint; denied the motion to modify the protective order; continued the stay of discovery; and stayed the dispositive motions deadline. Order [D.E. 67].

On May 17, 2023, the United States Court of Appeals for the Fourth Circuit dismissed plaintiff's March 10, 2023, interlocutory appeal for failure to prosecute, Order [D.E. 68], and entered its mandate [D.E. 69].

3

On May 18, 2023, plaintiff moved to freeze defendants' assets.  Mot. [D.E. 70].

On July 24, 2023, plaintiff moved for a pretrial conference.  Mot. [D.E. 73].

On October 13, 2023, plaintiff moved for an order to preserve evidence.  Mot. [D.E. 76].

On November 27, 2023, the court, *inter alia*: denied as futile the motion for leave to file an amended complaint; denied the motion to freeze defendants' assets; denied the motion for a pretrial conference; granted in part the motion to preserve evidence; lifted the stay of discovery; and referred the action to Judge Jones for entry of a new scheduling order.  See Order [D.E. 79].

On November 30, 2023, Judge Jones entered an amended scheduling order.  See Order [D.E. 80] (setting discovery and motions deadlines as Jan. 19 and Feb. 29, 2024, respectively).

On both January 26, 2024, and February 16, 2024, plaintiff moved for a discovery conference.  See Mot. [D.E. 82]; Mot. [D.E. 84].

On February 20, 2024, plaintiff moved to compel discovery.  Mot. [D.E. 85].

On February 29, 2024, defendants moved for summary judgment, Mot. [D.E. 86], and filed a statement of material facts [D.E. 87], an appendix [D.E. 88], and a memorandum [D.E. 89].

Pursuant to Roseboro v. Garrison, 528 F.2d 309, 310 (4th Cir. 1975) (per curiam), the court notified plaintiff about the motion for summary judgment, the response deadline, and the consequences of failing to respond.  [D.E. 90].

On March 5, 2024, the court, *inter alia*: denied as moot the first motion for a discovery conference, denied the second motion for a discovery conference, and denied the motion to compel discovery.  See Order [D.E. 92].

On March 11, 2024, plaintiff moved for a copy of defendants' motion for summary judgment.  Mot. [D.E. 93].

4

On March 21, 2024, plaintiff filed a response in opposition to defendants' motion for summary judgment.   Pl.'s Resp. [D.E. 94].

On April 1, 2024, plaintiff filed a self-styled "emergency motion to reconsider plaintiff's motion for discovery conference and motion to compel discovery [sic]."   Mot. [D.E. 95].

On April 2, 2024, defendants filed a reply.   Defs.' Reply [D.E. 96].

On April 29, 2024, plaintiff filed a further response in opposition to defendants' motion for summary judgment.   See Pl.'s 2d Resp. [D.E. 98].

On August 20, 2024, plaintiff filed a "motion for expedited order [sic]."   Mot. [D.E. 100].

<u>Plaintiff's Non-Dispositive Motions</u>:

Because plaintiff's response to defendants' motion for summary judgment includes a numbered statement of facts responsive to defendants' numbered statement of material facts, <u>see</u> Pl.'s Resp. Attach. [D.E. 94-2], it is apparent that plaintiff received defendants' filings in support of their motion for summary judgment.   Accordingly, the court DENIES AS MOOT plaintiff's motion seeking a copy of defendants' filings [D.E. 93].

In his motion for reconsideration, plaintiff argues that defendants are withholding discovery because Glorafield's responses to requests for admission confirm the existence of body worn camera footage of a January 18, 2019, traffic stop.   <u>See</u> Mot. [D.E. 95] at 1.   Plaintiff also argues that, because he is "suing the defendants in their individual and official capacities," "he is entitled to Fayetteville Police Department documents regarding policy and procedure pertaining to human trafficking and promoting prostitution."   <u>Id.</u> at 2.   Plaintiff asserts he "plans to subpoena and call as witnesses at trial supervisors of the human trafficking & prostitution department . . . to explain to the jury why it was made, its purpose and so forth [sic]," such that

5

"this information should be turned over." Id. Plaintiff contends that defendants have not complied with his discovery requests and the court should schedule a discovery conference. Id.

Defendants oppose this motion, arguing, *inter alia*: the January 18, 2019, traffic stop did not involve plaintiff such that the body worn camera footage has no relevance to plaintiff's arrest on February 4, 2019; plaintiff's sole intent in seeking discovery regarding the January 18, 2019, traffic stop is to challenge the investigation resulting in the probable cause for his subsequent arrest and conviction for promoting prostitution; and the discovery period is closed. See [D.E. 97].

There has been no trial or change of law, and plaintiff fails to show any clear error causing manifest injustice in the March 5, 2024, order denying his motions for a discovery conference and to compel discovery. See Carlson v. Boston Scientific Corp., 856 F.3d 320, 325 (4th Cir. 2017); American Canoe Ass'n v. Murphy Farms, Inc., 326 F.3d 505, 514–15 (4th Cir. 2003) ("Motions for reconsideration of interlocutory orders are not subject to the strict standards applicable to motions for reconsideration of a final judgment[,]" but instead are "committed to the discretion of the district court."). Accordingly, the court DENIES this motion for reconsideration [D.E. 95].

Next, the court GRANTS IN PART plaintiff's motion seeking expedited resolution of his pending motions, Mot. [D.E. 100], to the extent that the instant order satisfies his request.

<u>Defendants' Motion for Summary Judgment</u>:

The court now turns to defendants' motion for summary judgment. Mot. [D.E. 86]. For the reasons discussed below, the court GRANTS this motion.

1) Statement of Facts:

The facts are disputed as noted. Defendants state: "Since 2001, Plaintiff has been arrested in Cumberland County over fifty times for multiple crimes, including both promoting prostitution

6

and drug-related offenses." Defs.' Stmt. Mat. Facts [D.E. 87] at ¶1; but see Pl.'s Stmt. Mat. Facts [D.E. 94-2] at ¶1 (objecting to relevancy of his arrest record).

Defendants next state: "The crimes at issue in this civil suit involve Plaintiff posting advertisements and sexually explicit photographs of two females on a known prostitution website, and then arranging for the females to provide sexual acts to his clients in exchange for money." Defs.' Stmt. Mat. Facts [D.E. 87] at ¶2; but see Pl.'s Stmt. Mat. Facts [D.E. 94-2] at ¶2 (stating, "Denied: Also 'forcing the females to engage in sex for money [sic]'").

FPD officers interviewed an alleged prostitution victim, Lisa,[1] and defendant Graham had a role in the investigation, but the parties disagree about the details.[2] Compare Defs.' Stmt. Mat. Facts [D.E. 87] at ¶6 (stating: Graham "was the lead detective"; Graham "conducted an in-person interview of a female victim, who stated that Plaintiff forced her and another female to have sex

---

[1] The court uses the same pseudonym for this victim applied by the North Carolina Court of Appeals. See State v. McCormick, 289 N.C. App. 631, 888 S.E.2d 408 (2023), appeal dismissed, review denied, 898 S.E.2d 301 (N.C. 2024). Because the court finds that the interest in preserving this victim's confidentiality outweighs the public interest in disclosure, see Doe v. Public Citizen, 749 F.3d 246, 265 (4th Cir. 2014); Ashcraft v. Conoco, Inc., 218 F.3d 288, 302 (4th Cir. 2000), the court also will direct the clerk to seal all documents identifying this individual by name.

[2] Graham avers: Graham is a detective with the FPD and has served in that capacity since February 2015; in January 2019, Graham was assigned as the lead detective to investigate plaintiff for the alleged felony offense of promotion of prostitution. Defs.' App., Ex. O, Graham Aff. [D.E. 88-15] at ¶1. On January 24, 2019, Graham interviewed Lisa at Roxie Rehabilitation Center in Fayetteville North Carolina. Id. at ¶2. Lisa told Graham: Lisa and another female, Miranda Justice ("Miranda" or "Ms. Justice"), were forced by plaintiff to have sex in exchange for money; plaintiff took pictures of these females and posted them under the names "Zoey" and "Layla" on a website called "Skip the Games"; pursuant to inquiries regarding the photos, plaintiff arranged for Lisa and Ms. Justice to have sex with clients at a local motel called the Roadside Inn Motel; and plaintiff gave Lisa and Ms. Justice drugs, "such as crack cocaine, heroin and spice." Id. Plaintiff, by contrast, avers, inter alia, that: he met Lisa through Jason Godwin; during the days Lisa stayed with plaintiff, "she never engaged in any type of sexual activity, was not being abused and left to go back with Jason Godwin due to Plaintiff's possessions being stolen and no internet access on his flip phone," and "this all occurred before Thanksgiving 2018"; plaintiff did not see Lisa again until Ms. Justice "called Jason Godwin dad [sic] to pick us up from a car accident [plaintiff] was in on 12-20-2018"; he met Ms. Justice after he met Lisa and Jason Godwin "around December 2018"; while he "was at hospital from [his] injuries," Lisa and Jason Godwin "needed money for drugs, cigarettes and to fix a tire on Jason's car[,] so [Ms.] Justice showed [Lisa] how to post an [advertisement] and [Lisa] did one two-girl date allegedly with [Ms. Justice]"; "After the date[, Lisa] got her earnings and left the hotel room with other individuals"; during a January 18, 2019, traffic stop, Jason Godwin was given a ticket and Lisa was taken into custody; and "at Roxy Rehab Center [sic]," Lisa was interviewed by Detective Hockenberry and defendant Glorafield on January 23, 2019, and by defendant Graham on January 24, 2019. See Pl.'s Aff. [D.E. 94-5] at ¶¶2–11. The court takes judicial notice that Thanksgiving Day fell on November 22, 2018.

7

with clients in exchange for money while at a local motel"; and "It was also learned that Plaintiff provided the two females with drugs"), <u>with</u> Pl.'s Stmt. Mat. Facts [D.E. 94-2] at ¶6 (stating, "Denied: Everette Hockenberry (also a lead investigator) along with [defendant] Glorafield conducted [an] interview with alleged victim whom [sic] stated 'she received a portions [sic] of her money from her dates and she never did anything sexual at all while with Plaintiff'").

Graham further investigated,[3] but the parties disagree as to the relevant offense date. <u>Compare</u> Defs.' Stmt. Mat. Facts [D.E. 87] at ¶7 (stating that Graham "discovered that on or about December 20, 2018, Plaintiff used his account to post sexually explicit photographs of the two females and advertise their services for sex on a known prostitution website," and that Graham "confirmed Plaintiff's promotion of prostitution through review of local motel receipts showing where the two females were forced to engage in sexual acts with clients"), <u>with</u> Pl.'s Stmt. Mat. Facts [D.E. 94-2] at ¶7 (stating, "Irrelevancy: 12-20-2018 offense date is not an issue in this lawsuit, only 11-25-2018").

---

[3] Graham avers, *inter alia*: Graham located the website, "which appeared to be a site for soliciting prostitution," entered the pseudonym "Layla" in the keyword search, and that the results showed posts of Lisa and Ms. Justice, dated Dec. 20 and 21, 2018, including partially nude photos, that "advertised their services of sex acts in exchange for money." Defs.' App., Ex. O, Graham Aff. [D.E. 88-15] at ¶3. Graham contacted "'Skip the Games' and requested the log in and account information for the posts," and "was provided with an email address of Fahrenheit26910@gmail.com." <u>Id.</u> at ¶4. This email address was familiar to Graham from a case she investigated in 2015 where the suspect was plaintiff. <u>Id.</u> Graham went to the Roadside Inn Motel, spoke with the manager, and requested any receipts associated with plaintiff or Ms. Justice. <u>Id.</u> The manager provided Graham "with 4-5 receipts for the dates of 12/20/2018 and 12/21/2018" that were in the name of Ms. Justice. <u>Id.</u> On January 25, 2019, Graham "applied for a search warrant to Google to confirm the holder of the email address Fahrenheit26910@gmail.com and Fahrenheittwosix@gmail.com." <u>Id.</u> at ¶5. On February 1, 2019, Graham received a response from Google that both stated the account holder of these email addresses was plaintiff and provided a phone number associated with the account "that matched the number that was currently on file at the police department" for plaintiff. <u>Id.</u> at ¶6. Circa February 1, 2019, the FPD "received an email from the manager of the Quality Inn motel in Fayetteville, North Carolina." <u>Id.</u> at ¶7. "The manager suspected that a guest, [plaintiff], was prostituting women and distributing controlled substances." <u>Id.</u> Plaintiff "was observed by the manager with multiple women in the motel lobby." <u>Id.</u> "A few days later, [Graham] went to the Quality Inn and spoke with the manager who informed [Graham] that he sees [plaintiff] there frequently, always with different young women, and he pays cash for additional stays." <u>Id.</u> at ¶8. "The manager then gave [Graham] the receipts for the days that [plaintiff] stayed at the Quality Inn." <u>Id.</u> "These receipts showed dates of January 1-15 and January 30, 31 of 2019, and also February 1-3 of 2019." <u>Id.</u>

8

The parties further disagree whether Graham made false statements to a Cumberland County Magistrate Judge on February 4, 2019, to obtain arrest warrants for plaintiff.[4] Compare Defs.' Stmt. Mat. Facts [D.E. 87] at ¶8 (stating: "After completing her investigation, on February 4, 2019, [defendant] Graham appeared before a Cumberland County Magistrate Judge and provided the evidence she had discovered through her investigation"; and "Based on this evidence, the Magistrate Judge found probable cause existed and issued two arrest warrants for Plaintiff on the felony charges of promoting prostitution"), with Pl.'s Stmt. Mat. Facts [D.E. 94-2] at ¶8 (stating, "Denied: [defendant] Graham gave false statements to magistrate to secure arrest warrant baring 11-25-2018 offense date [sic].").

On February 4, 2019, arrest warrants issued as to plaintiff for two felony offenses of promoting prostitution, but the parties again disagree as to the date of the offenses at issue and whether these arrest warrants were valid. Compare Defs.' Stmt. Mat. Facts [D.E. 87] at ¶3 (stating, "These offenses occurred on or about December 20, 2018" and "valid arrest warrants were issued"),[5] with Pl.'s Stmt. Mat. Facts [D.E. 94-2] at ¶3 (stating, "Denied: These offenses allegedly occurred on 11-25-2018. Valid arrest warrants were not issued.").

Also on February 4, 2019, pursuant to these arrest warrants, plaintiff was arrested by defendant Bass in his vehicle after he exited a Buffalo Wild Wings Restaurant. Defs.' Stmt. Mat.

---

[4] Graham avers that, on February 4, 2019, Graham "appeared before a Cumberland County Magistrate Judge and provided the evidence discovered through [Graham's] investigation of [plaintiff], including the posting of photos of the two females on the website on or about December 20, 2018." Defs.' App., Ex. O, Graham Aff. [D.E. 88-15] at ¶9. Graham provided this evidence verbally, not via written warrant affidavits. See [D.E. 91] at ¶10. Plaintiff avers that, based upon January 23 and 24, 2019, interviews with Lisa, defendant Graham "appeared before Magistrate Stafford to swear out probable cause for arrest on charges of promoting prostitution." Pl.'s Aff. [D.E. 94-5] at ¶12.

[5] Graham avers: "Based on this evidence, the Magistrate Judge found probable cause existed and issued two arrest warrants for Plaintiff on the felony charges of promoting prostitution," with one warrant regarding an offense as to Lisa, and the other regarding an offense as to Ms. Justice. Defs.' App., Ex. O, Graham Aff. [D.E. 88-15] at ¶9.

Facts [D.E. 87] at ¶9.[6]   Illegal drugs were found in the vehicle, "plaintiff also was arrested on

felony drug-related charges," he was transported to Cumberland County Jail, processed, and held

on a $30,000 secure bond,[7] see id. at ¶4; accord Pl.'s Stmt. Mat. Facts [D.E. 94-2] at ¶4, but the

parties dispute what drugs were found, compare Defs.' Stmt. Mat. Facts [D.E. 87] at ¶9 (identifying

the "illegal controlled substances in Plaintiff's vehicle" as "including heroin, crack cocaine and

marijuana"), with Pl.'s Stmt. Mat. Facts [D.E. 94-2] at ¶9 (stating: "the controlled substances were

not what they allegedly were after tested which came back fentanyl & powder cocaine [sic]").

On February 5, 2019, an arrest warrant issued for drug-related charges based on the

controlled substances found in the vehicle, plaintiff was served with this warrant, and plaintiff

---

[6] Graham avers plaintiff "was arrested in his vehicle" on outstanding warrants by defendant J.C. Bass after plaintiff and Ms. Justice exited a Buffalo Wild Wings restaurant.   Defs.' App., Ex. O, Graham Aff. [D.E. 88-15] at ¶10.   Bass avers, inter alia: on February 4, 2019, plaintiff, "a person with outstanding arrest warrants for promoting prostitution, was located . . . inside a restaurant with another subject," Ms. Justice; "As both individuals were exiting the restaurant[,] they began approaching a white Volvo"; plaintiff "sat down in the driver's seat and Ms. Justice sat down in the passenger's seat"; Bass, Glorafield, and "members of the Violent Criminal Apprehension Team" were present; "We approached the vehicle with our patrol vehicles and blocked it from leaving the parking space it was occupying"; "We then exited our vehicles and began giving both subjects orders to place their hands where they could be seen"; plaintiff "began reaching with his right hand toward the passenger's side of the vehicle"; plaintiff "was ordered to place his hands on the steering wheel"; plaintiff "continued to reach over toward the passenger, [Ms.] Justice, and then placed his hands on the steering wheel"; Bass "then approached the driver's side of the vehicle and ordered [plaintiff] out of the vehicle"; another officer "began detaining Ms. Justice from the passenger's side"; and Bass "was able to remove [plaintiff] from the vehicle and place him under arrest with the assistance of [defendant] Glorafield.   See id., Ex. P, Bass Aff. [D.E. 88-16] at ¶¶2–4.   Plaintiff, by contrast, avers that defendants Bass and Glorafield "arrested plaintiff unlawfully on 2-4-2019 as he was engaging in lawful conduct [sic]."   Pl.'s Aff. [D.E. 94-5] at ¶13.

[7] Graham avers that arresting officers located illegal drugs in plaintiff's vehicle, including heroin, crack cocaine, and marijuana.   Defs.' App., Ex. O, Graham Aff. [D.E. 88-15] at ¶10.   Bass avers, inter alia: "After Ms. Justice was removed from the vehicle, we located two bags of controlled substances in plain view on the passenger's seat"; "The two bags of controlled substances were removed from the vehicle"; one bag "appeared to be marijuana"; the other bag "appeared to have two types of controlled substances separated into two bags, but stored together"; one substance "appeared to have multiple 'crack rocks,'" field tested positive for cocaine base, and weighed 1 gram; "the other substance appeared to be powder and had a tan colored appearance," "filed tested positively for heroin," and weighed 2 grams; "Because of the observed actions of [plaintiff], it was obvious that he was placing the bags of controlled substances in the lap or in the seat where Ms. Justice was seated during our approach"; plaintiff "has an extensive drug history for sell and deliver"; "With these facts, and the way the controlled substances were packaged[,] it was determined that the appropriate charges for [plaintiff] would be Possession with intent to Manufacture, Sell and Deliver Cocaine, Possession with intent to sell and Deliver Heroin, and Misdemeanor Possession of Marijuana"; and Bass transported plaintiff to the Cumberland County Jail and processed plaintiff "on his outstanding warrants for promoting prostitution where he was held on a $30, 000 secure bond."   Id., Ex. P, Bass Aff. [D.E. 88-16] at ¶¶4–7.

appeared before a Magistrate Judge and was given a $7,500 secure bond for drug-related charges.[8] Defs.' Stmt. Mat. Facts [D.E. 87] at ¶10; accord Pl.'s Stmt. Mat. Facts [D.E. 94-2] at ¶10.

On April 4, 2019, plaintiff appeared before Cumberland County Judge Caitlyn Evans on a hearing regarding the two felony charges for promoting prostitution, but the parties disagree as to the details. Compare Defs.' Stmt. Mat. Facts [D.E. 87] at ¶11 (stating: "During the hearing, it was discovered that the offense dates stated on the two February 4, 2019, arrest warrants for promoting prostitution were incorrect"; "The offense dates were incorrectly listed as '11/25/2018 through 11/25/2018'"; "The actual offense dates should have been listed as '12/20/18 through 12/21/2018'"),[9] and id. at ¶12 (Graham "explained to the Court that this was an inadvertent clerical error and could be easily corrected"; "Out of abundance of caution [sic] and to prevent any later confusion, Judge Evans directed Detective Graham to have new arrest warrants issued for Plaintiff on the same charges with the correct offense dates"; "Judge Evans also instructed the courtroom clerk to inform the Magistrate Judge to issue new warrants with the correct offense dates"),[10] with Pl.'s Stmt. Mat. Facts [D.E. 94-2] at ¶11 (stating, "Denied: after evidence presented testimony given District Court Judge Caitlyn Evans found no probable cause for arrest due to lack of evidence

---

[8] Bass avers, inter alia: "On February 5, 2019, [Bass] presented probable cause to Magistrate Judge Peterson for the above [drug-related] charges, and arrest warrants were granted"; Bass "then served the arrest warrants on" plaintiff; and plaintiff "received a $7,500 secure bond for the new charges." Defs.' App., Ex. P, Bass Aff. [D.E. 88-16] at ¶8.

[9] Graham avers: at the April 4, 2019, hearing "it was discovered that the offense dates stated on the two February 4, 2019, arrest warrants were incorrect"; the offense dates were incorrectly listed as 11/25/2018 through 11/25/2018, but should have been listed as 12/202018 through 12/21/2018"; Graham "had mistakenly typed the incorrect offense dates on the arrest warrants when originally completed"; and this "was an inadvertent error, not intentional, and there was no improper purpose for listing the incorrect dates." Defs.' App., Ex. O, Graham Aff. [D.E. 88-15] at ¶12.

[10] Graham avers: at the April 4, 2019, hearing, Graham "explained to Judge Evans that this was an inadvertent clerical error and could easily be corrected"; out of an abundance of caution and to prevent any later confusion, Judge Evans directed [Graham] to have new arrest warrants issued for the same offenses with the correct offense dates; and "Judge Evans also instructed the courtroom clerk to inform the Magistrate Judge to issue new warrants with the correct offense dates." Defs.' App., Ex. O, Graham Aff. [D.E. 88-15] at ¶13.

11

presented on date of arrest warrant [sic]"); and id. at ¶12 (stating: "Denied: [defendant] Graham testified at probable cause hearing and District Court Judge Caitlyn Evans after hearing evidence ant testimony dismissed both case files 19CR051565-66 due to lack of evidence presented on date of arrest warrant and closed the case never directing [defendant] Graham to have new arrest warrants issued for Plaintiff on the same charges with the correct offense dates [sic]").[11]

Also on April 4, 2019, a Magistrate Judge issued new arrest warrants for plaintiff with offense dates from December 20 to 21, 2018, and plaintiff was served with these arrest warrants.[12] See Defs.' Stmt. Mat. Facts [D.E. 87] at ¶13; but see Pl.'s Stmt. Mat. Facts [D.E. 94-2] at ¶13 (stating, "Denied: On 4-4-2019 the state violated § 15A-612(b) by recharging Plaintiff again using the same evidence and again that has no relevance to this pending lawsuit [sic]").

On July 1, 2021, after a jury trial, plaintiff was found guilty of, *inter alia*, promoting prostitution as to both Lisa and Ms. Justice on December 20, 2018, and intent to sell or distribute cocaine as to the drugs discovered in his vehicle during his February 4, 2019, arrest. See Defs.' Stmt. Mat. Facts [D.E. 87] at ¶14; but see Pl.'s Stmt. Mat. Facts [D.E. 94-2] at ¶14 (stating, "Irrelevant! This lawsuit only covers on dates of 2-4-2019 – 4-4-2019 [sic]").

On July 2, 2021, plaintiff was sentenced on these charges by a Cumberland County Superior Court Judge, and he remains incarcerated "on these various felony charges, among others." Defs.' Stmt. Mat. Facts [D.E. 87] at ¶15; but see Pl.'s Stmt. Mat. Facts [D.E. 94-2] at ¶15 (stating, "Irrelevant! This lawsuit only covers on dates of 2-4-2019 through 4-4-2019 [sic]").

---

[11] Plaintiff, avers: "Plaintiff remained restrained against his liberty until 4-4-2019 where District Court Judge Caitlyn Evans found no probable cause for arrest and dismissed all charges [sic]." Pl.'s Aff. [D.E. 94-5] at ¶14.

[12] Graham avers, on April 4, 2019, she appeared before a Magistrate Judge who issued new arrest warrants for plaintiff on the same felony charges of promoting prostitution, "based on the previously provided probable cause evidence," with correct offense dates of 12/20/2018 through 12/21/2018, and plaintiff was served with the new arrest warrants that afternoon at the Cumberland County Detention Centner. Defs.' App., Ex. O, Graham Aff. [D.E. 88-15] at ¶14.

12

2) Legal Standard:

Summary judgment is appropriate when, after reviewing the record as a whole, the court determines that no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). The moving party initially must demonstrate the absence of a genuine issue of material fact or the absence of evidence to support the nonmoving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the nonmoving party may not rest on the allegations or denials in its pleading, Anderson, 477 U.S. at 248–49, but "must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis and quotation omitted). A court reviewing a motion for summary judgment should determine if a genuine issue of material fact exists for trial. Anderson, 477 U.S. at 249. In making this determination, the court must view the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party. Scott v. Harris, 550 U.S. 372, 378 (2007).

3) Discussion:

The court first addresses plaintiff's contention that there was no probable cause for his February 4, 2019, arrest pursuant to arrest warrants, in violation of the Fourth Amendment. See U.S. Const. amend. IV (providing, in relevant part, "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."). This amounts to a claim for "malicious prosecution." Smith v. Munday, 848 F.3d 248, 257 (4th Cir. 2017) ("a claim for malicious prosecution alleges that an arrest made pursuant to a warrant lacked probable cause" (citing Brooks v. City of Winston–Salem,

13

85 F.3d 178, 181–82 (4th Cir. 1996))); see Evans v. Chalmers, 703 F.3d 636, 647 (4th Cir. 2012) ("A 'malicious prosecution claim under § 1983 is properly understood as a Fourth Amendment claim for unreasonable seizure which incorporates certain elements of the common law tort.'" (quoting Lambert v. Williams, 223 F.3d 257, 261 (4th Cir. 2000))).

Success on a malicious prosecution claim requires a showing that defendants "(1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in the plaintiff's favor." Humbert v. Mayor & City Council of Baltimore City, 866 F.3d 546, 555 (4th Cir. 2017), as amended (Aug. 22, 2017) (quoting Evans, 703 F.3d at 647); see also Thompson v. Clark, 596 U.S. 36, 49 (2022) (holding the favorable termination element of a § 1983 malicious prosecution claim requires only a showing that the prosecution ended without a conviction, not an affirmative indication of plaintiff's innocence).

Succinctly defined, "'probable cause' to justify an arrest means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." Michigan v. DeFillippo, 443 U.S. 31, 37 (1979); see Humbert, 866 F.3d at 555–56 ("Probable cause is 'an objective standard of probability that reasonable and prudent persons apply in everyday life,' and determined by a 'totality-of-the-circumstances' approach. 'While probable cause requires more than bare suspicion, it requires less than that evidence necessary to convict.'" (citations omitted)).

As noted above, Graham avers she took numerous investigative steps in January and February 2018 before obtaining arrest warrants for plaintiff on February 4, 2019. See Defs.' App., Ex. O, Graham Aff. [D.E. 88-15] at ¶¶1–8 (averring, inter alia: Graham interviewed Lisa who

14

described being forced by plaintiff to have sex in exchange for money after plaintiff 1) posted pseudonymous photographs of Lisa and Miranda Justice to a website, 2) arranged for them to have sex at the Roadside Inn Motel with clients who inquired about these website photographs, and 3) gave them illegal drugs; Graham viewed the website, "which appeared to be a site for soliciting prostitution," and conducted a keyword search using one of the pseudonyms that revealed partially nude photographs of the females; Graham contacted the website which provided an email address familiar to Graham from a prior case involving plaintiff; Graham met with the Roadside Inn Motel manager who provided receipts for the dates of 12/20/2018 and 12/21/2018 in the name of Ms. Justice; Graham contacted Google and confirmed the email address belonged to plaintiff; and, after the Quality Inn manager emailed the FPD about plaintiff's possible involvement with prostitution, Graham met with this manager who 1) informed Graham that plaintiff was at the hotel frequently, always with different young women, and that plaintiff pays cash for additional stays, and 2) provided Graham with receipts for various days plaintiff stayed at this hotel in Jan. and Feb. 2019).

Graham further avers that, on February 4, 2019, Graham "appeared before a Cumberland County Magistrate Judge and provided the evidence discovered through [Graham's] investigation of [plaintiff], including the posting of photos of the two females on the website on or about December 20, 2018." See id. at ¶9.

The arrest warrants at issue, however, plainly list the offense date as "on or about November 25, 2018." See Defs.' App., Ex. D [D.E. 88-4] at 1–2 (arrest warrant in 19CR051565 charging plaintiff with one count of posting photos of Lisa on the internet for the purpose of prostitution, in violation of N.C. Gen. Stat. §14-205.3(A)(1)); id., Ex. E [D.E. 88-5] (arrest warrant in 19CR051566 charging plaintiff with one count of posting photos of Ms. Justice on the internet

15

for the purpose of prostitution in violation of N.C. Gen. Stat. §14-205.3(A)(1)); see also Pl.'s Ex. A [D.E. 94-4] at 1 (warrant information form listing the date of offense as Nov. 25, 2018).

The record also supports plaintiff's undisputed averment that, at a hearing on April 4, 2019, Cumberland County Judge Caitlyn Evans dismissed for lack of probable cause the lone counts in both 19CR051565 and 19CR051566. Pl.'s Aff. [D.E. 94-5] at ¶14; see Pl.'s Ex. B [D.E. 94-4] at 3 (notating no probable cause as to count 1 of the warrant, dismissing that count, and writing, in "other," "no evidence presented on date of offense on warrant [sic].").

Although plaintiff disputes that part of Graham's averment that Judge Evans directed Graham to have new arrest warrants issued for the same offenses with a corrected date, compare Pl.'s Stmt. Mat. Facts [D.E. 94-2] at ¶11, with Defs.' App., Ex. O, Graham Aff. [D.E. 88-15] at ¶13, he does not contest Graham's averments that, at the April 4, 2019, hearing, Graham learned for the first time that she "had mistakenly typed the incorrect offense dates on the arrest warrants when originally completed," and "explained to Judge Evans that this was an inadvertent clerical error and could easily be corrected," Defs.' App., Ex. O, Graham Aff. [D.E. 88-15] at ¶¶12–13.

The record also supports Graham's undisputed averment that, on April 4, 2019, Graham appeared before a Magistrate Judge who issued new arrest warrants for plaintiff on the same felony charges of promoting prostitution, "based on the previously provided probable cause evidence," with correct offense dates of 12/20/2018 through 12/21/2018, and that plaintiff was served with the new arrest warrants that afternoon at the Cumberland County Detention Centner. See Defs.' App., Ex. O, Graham Aff. [D.E. 88-15] at ¶14; id., Ex. H [D.E. 88-4] at 1–2 (19CR054262 charging plaintiff with posting photos of Lisa on the internet for the purpose of prostitution, in violation of N.C. Gen. Stat. § 14-205.3(a)(1), with an offense date of Dec. 20, 2018, through Dec. 21, 2018).

16

The record also support's defendants' statement that plaintiff later was convicted on these charges with an offense date circa December 20, 2018. Defs.' Stmt. Mat. Facts [D.E. 87] at ¶15; see Defs.' App., Ex. I, [D.E. 88-9] at 1 (19CRS54261 verdict sheet finding plaintiff guilty of, *inter alia*, promoting prostitution by soliciting on Dec. 20, 2018); id., Ex. K [D.E. 88-11] (printout noting plaintiff's guilty verdict in 19CRS054262 for promoting prostitution on Dec. 20, 2018).

Although plaintiff argues that Graham's listing the offense date as November 25, 2018, rendered the February 4, 2019, arrest warrants invalid, federal courts that have considered the issue have found that such a clerical error does not invalidate a warrant. See, e.g., United States v. Carter, 756 F.2d 310, 313 (3d Cir. 1985) ("Carter"), cert. denied, 478 U.S. 1009 (1986) (finding, although the warrant incorrectly listed the date of the robbery as September 14, 1983, instead of September 7, 1983, this "mere technical error does not automatically invalidate the warrant" because it is not a "material or critical variance," did not "negate any of the elements of the charged offense," or otherwise "affect the validity of the charge" (citations omitted)); McLean v. Mallott, 10 F.3d 806, 1993 WL 455239, at *1 (4th Cir. Nov. 5, 1993) (unpublished) (per curiam) (citing Carter and finding, "the typographical error in the date on his arrest warrant did not render the warrant invalid"); Cromer v. United States, 142 F.2d 697 (D.C. Cir. 1944) (noting, as to variance in an indictment: "The true inquiry . . . is . . . whether there has been such a variance as to 'affect the substantial rights' of the accused." (quoting Berger v. United States, 295 U.S. 78, 82 (1935))); United States v. Espindola-Pineda, No. 4:15-CR-29-FL-1, 2016 WL 791063, at *9 (E.D.N.C. Feb. 3, 2016) (finding an offense date error did not render warrant invalid), report and recommendation adopted sub nom. United States v. Espindola-Pineda, No. 4:15-CR-29-FL, 2016 WL 782397 (E.D.N.C. Feb. 29, 2016); Colclough v. Dennis, No. CA 6:07-3548HMHWMC, 2009 WL 73810,

17

at *5 (D.S.C. Jan. 7, 2009) (finding that the incorrect listing of an address on an arrest warrant was a scrivener's error that "does not invalidate the warrant in any way"); United States v. Hull, No. 2:05CR37-2, 2005 WL 5921161, at *5 (N.D.W. Va. Nov. 9, 2005) (finding the misspelling of a name on a warrant was a mere technical error that did not invalidate the warrant), aff'd in part, dismissed in part, 239 F. App'x 809 (4th Cir. 2007). The court finds these cases persuasive.

Additionally, North Carolina law provides that, although an arrest warrant "must contain a statement of the crime of which the person to be arrested is accused," "[n]o warrant for arrest, nor any arrest made pursuant thereto, is invalid because of any technicality of pleading if the statement is sufficient to identify the crime." N.C. Gen. Stat. § 15A-304(c). North Carolina courts similarly have found that imprecise offense dates do not invalidate search warrants or indictments. See, e.g., State v. Rayfield, 231 N.C. App. 632, 643, 752 S.E.2d 745, 754 (2014) ("an inadvertent error by an officer making [a search warrant] affidavit, when he or she did not know it was an error, may be immaterial where the affidavit is still sufficient on its face to support a finding of probable cause." (citation omitted)); State v. Locklear, 117 N.C. App. 255, 260, 450 S.E.2d 516, 519 (1994) (finding, "because the date alleged in the indictment is neither an essential nor a substantial fact as to the charge of habitual felon," "the trial court properly allowed the State to change the habitual felon indictment"); State v. Cameron, 83 N.C. App. 69, 72, 349 S.E.2d 327, 329 (1986) ("Ordinarily, the date alleged in the indictment is neither an essential nor a substantial fact, and therefore the State may prove that the offense was actually committed on some date other than that alleged in the indictment without the necessity of a motion to change the bill. The failure to state accurately the date or time an offense is alleged to have occurred does not invalidate a bill of indictment nor does it justify reversal of a conviction obtained thereon." (citations omitted)).

18

Considering plaintiff's claim that Graham lied to the Magistrate Judge to obtain the February 4, 2019, arrest warrants, the court applies the two-pronged test from Franks v. Delaware, 438 U.S. 154, 155–56 (1978) ("Franks"); see Miller v. Prince George's Cnty., 475 F.3d 621, 627 (4th Cir. 2007) (applying the Franks framework to Fourth Amendment claims under § 1983).

A Franks violation requires a showing "that the affiant either intentionally or recklessly made a materially false statement or that the affiant intentionally or recklessly omitted material information from the affidavit. Thus, Franks requires proof of both intentionality and materiality." United States v. Wharton, 840 F.3d 163, 168 (4th Cir. 2016) (citation omitted). A plaintiff shows "intentionality" when no record evidence lends support for a police officer's statements underlying the affidavit. Evans, 703 F.3d at 650. "Materiality" means that, if the affidavit were corrected, it would no longer establish probable cause. Wharton, 840 F.3d at 168.

Plaintiff argues that Graham "stated a series of untrue events[,] violating plaintiff's clearly established due process rights, so that the Magistrate could return an arrest warrant with an offense date of 11-25-2018," and he disputes the characterization that "the victim was forced to engage in sex acts by Plaintiff [sic]." Pl.'s Mem. [D.E. 94-1] at 2–3. In support of these arguments, plaintiff seeks to rely upon Lisa's statements and testimony about her pre-Thanksgiving 2018 stay with plaintiff when Lisa purportedly didn't engage in prostitution, and Lisa's statements to FPD officers that she "ended up turning tricks" because of Miranda Justice and, "when she did a date[,] [Lisa] received a portion of hear earnings and gave the rest to plaintiff's co-defendant," Ms. Justice. Id. at 3; see also Pl.'s Ex. A [D.E. 94-4] at 1 (Warrant Information form stating, as narrative, "On 11/25/2018 [plaintiff] did post photos of the victim Miranda Justice on the internet for the purpose of Prostitution); id., Pl.'s Ex. C, [D.E. 94-4] at 6 (transcript excerpt of Graham interview of Lisa

19

including, *inter alia*: in response to Graham's query as to how Lisa "ended up turnin' tricks [sic]," Lisa's responses, "Um, probably Marcus" and, subsequently, "Um, no, it was probably Jason. I don't really know"); id., Pl.'s Ex. D, [D.E. 94-4] at 7 (transcript excerpt of Graham interview of Lisa including, *inter alia*: Lisa's statements that other girls advised her it would be "easy, fast money," and Lisa then "did a 2-girl special with Miranda" where they "went to like, uh, the Holiday Inn and like the Roadside"; Lisa's statement, "Miranda, like, they had like an actual setup . . . they put it on the Back Page and then other websites, and then like, um, Marcus was like, you know, I'm gonna get a cut of this and, 'cause I put you on and all this stuff [sic]"; Graham's question, "so you were doing 2-girl special with Miranda? Okay. Miranda was already doin' this. Okay. Who was she doin' it with?" Lisa's response, "Marcus," followed by Graham's statement, "Marcus, okay. So she was workin' for Marcus? Okay, Marcus tells you when you get with Miranda that he's gonna get a cut of your money also? Okay"; Lisa's statement that she was driven to the hotel by others, not Marcus, because "he had just gotten out of the car accident" and "didn't have a car"; Graham's query "when you turned trucks [sic], then you made your money, who did you give your money to," to which Lisa responded that she "didn't get the money at first" because Miranda "would pick up the money and then she would hand [Lisa] like fifty or forty dollars"); id., Pl.'s Ex. E, [D.E. 94-4] at 8–9 (transcript excerpt of Detective Hockenberry interview of Lisa including, *inter alia*: Lisa's statement that "we did like a duo thing" for "200 an hour a hundred [for] 30 minutes"; Lisa's agreement that she "always did two girl dates" with Miranda; Hockenberry's question, "So these dates, um with you and Miranda was between 21 through 26 December [sic]," Lisa's response, "No," Hockenberry's further question, "when was that?" and Lisa's further response, "December, um, 21st to 26th. I mean I was there on Christmas.

20

That's what I was doing on Christmas. I remember waking up to a needle in my arm because I was passed out unconscious and I couldn't wake up and, and like that's how I had to wake up, like [sic]."; Hockenberry's follow-up question, "who were you doin' tricks for at Roadside at that point [sic]," and Lisa's response, "Um, I wasn't with anybody. I was just with Tracy. I was hanging out with him. . . ."; Hockenberry's question, "Now did you keep the money when you did tricks on Roadside for Tracy?" and Lisa's response, "No, no, I didn't do tricks for him. I was doing it with him. Not like that. I was just doing to like me and him have a mutual agreement I guess [sic]"; Hockenberry's question, "what was that mutual agreement?" and Lisa's response, "Uh, like he would take care of me if I stayed what [sic] him"; Hockenberry's question, "and how was that?," and Lisa's response, which appears to say, "he'd get me high"; Hockenberry's question, which appears to be "So you got to stay in the room," to which Lisa appears to respond, "Mm hmm [sic]."); id., Pl.'s Ex. E2, [D.E. 94-4] at 11 (Jan. 23, 2019, redacted FPD report noting, *inter alia*: Lisa "stated that she and Miranda stayed in the Roadside Inn . . .where she and Miranda did 'tricks' together during the timeframe of 12/20/2018 – 12/26/2018 where she was posted on skip the games website with Miranda for two girl special sex dates [sic]"; Lisa "stated that during the timeframe she had been in the Fayetteville area that she did sex dates for money," and that plaintiff and Miranda Justice, among other people, "profited from them"; and that "she actually remembered a distinct date range of 12/20/2018 – 12/26/2018 where she did sex dates with Miranda at the Roadside Inn, and was posted on skip the games website"); id., Pl.'s Ex. F, [D.E. 94-4] at 12, 14 (transcript excerpt of Detective Hockenberry interview of Lisa including, *inter alia*: Lisa's statements about spending "3 days" at "Mike's house" in "November, early November," when she "didn't know [she] could leave," that she did not "do dates" in those three days, but that she used

21

drugs and became ill); id. at 13 (transcript excerpt of Detective Hockenberry interview of Lisa including, *inter alia*: Lisa's statements that, after Dennis "was getting raided," "we bought a hotel room for, uh, like 6 days or 4 days, somethin' like that, a couple of days and then, um we stayed in there while the room or while the house was hot [sic]," "And then um Marcus and, uh, Miranda, while [Lisa] was with them, we went to like three hotels, three different days and then we were on that webs, web page or whatever"; Hockenberry's response, "what?"; Lisa's reply "Um, they put me on, uh, what's it called? Uh, it's not Back page but it was like Back Page that just got taken down"; Hockenberry's response that, "there is multiple ones [sic]," and querying "Is it One Back Page, Back Page dot, um, Skip the Game, City ****", Lisa's response, "Yeah," Hockenberry's question, "it's, uh, are you sure?," and Lisa's response, "Mm hmm"); id., Pl.'s Ex. G, [D.E. 94-4] at 15 (purported trial transcript of plaintiff's cross examination of Lisa including, *inter alia*: Lisa's apparent testimony that she had been in Fayetteville for approximately two months before meeting plaintiff; plaintiff's query, "during the time you was with me at Mike's house did you do any dates for anyone [sic]?" with Lisa's response, "I don't recall"; and plaintiff's query, "Isn't it a fact that anytime you was with me we never did anything sexual at all [sic]?" with Lisa's response, "Yes"); id., Pl.'s Ex. H, [D.E. 94-4] at 16 (purported trial transcript of plaintiff's cross examination of Lisa including, *inter alia*: plaintiff's query "Isn't it a fact that after I told you that, you stated thanks and you're the first person I've met in Fayetteville who hasn't taken advantage of me [sic]," with Lisa's response, "correct"); id., Pl.'s Ex. I, [D.E. 94-4] at 17–18 (transcript excerpt of Graham interview of Miranda Justice including, *inter alia*: as to Graham's question who took pictures of Ms. Justice's feet, Ms. Justice's reply that either Marcus or Jason took pictures of her feet at the Roadside Motel; as to Graham's question "do you know who posted these?," Ms. Justice's

22

response, "Marcus, or – Marcus?"; and as to Graham's question whether Ms. Justice ever "posts,"

Ms. Justice's response, "I've posted myself" and "I've only done it, I reposted 'em to Marcus, or

I don't know who, though who ****, 'cause I needed money at the hotel [sic]").

Notably, plaintiff does not contest Graham's averments that the evidence she presented to

the Magistrate Judge when seeking arrest warrants on February 4, 2018, "include[ed] the posting

of photos of the two females on the website on or about December 20, 2018," but that, due to

inadvertent clerical error, she "mistakenly typed the incorrect offense dates on the arrest warrants

when originally completed." See Defs.' App., Ex. O, Graham Aff. [D.E. 88-15] at ¶¶9, 12–13.

Plaintiff fails to demonstrate that Graham listing the offense date as on or about November

25, 2018, was an intentional or reckless false statement, instead of a mere inadvertent clerical error.

See Carter, 756 F.2d at 313; McLean, 10 F.3d 806, 1993 WL 455239, at *1. The record evidence,

including Graham's averments about her investigation and February 4, 2019, verbal presentation

to the Magistrate Judge, see Defs.' App., Ex. O, Graham Aff. [D.E. 88-15] at ¶¶1–9, and plaintiff's

exhibits of FPD reports and interviews, see Pl.'s Ex. C, D, E, E2, F, I, [D.E. 94-4] at 6–9, 11–14,

17–18, shows that, under the "totality-of-the-circumstances," Humbert, 866 F.3d at 555–56, what

Graham knew or reasonably believed at the time she sought the February 4, 2019, arrest warrants,

see DeFillippo, 443 U.S. at 37, could support a finding of probable cause to arrest plaintiff on

charges of promoting prostitution as to Lisa and Ms. Justice, see N.C. Gen. Stat. § 14-205.3(a)(1)

(providing, inter alia, any person who willfully, "advances prostitution," "commits promoting

prostitution"); N.C. Gen. Stat. § 14-203 (defining "advance prostitution" as, inter alia: "Soliciting

for a prostitute by performing any of the following acts . . . 1. Soliciting another for the purpose

of prostitution. 2. Arranging or offering to arrange a meeting of persons for the purpose of

23

prostitution. 3. Directing another to a place knowing the direction is for the purpose of prostitution. 4. Using the internet, including any social media Web site, to solicit another for the purpose of prostitution."). Thus, even in the light most favorable to plaintiff, he still fails to satisfy the "intentionality" prong for a Franks violation. Cf. Evans, 703 F.3d at 650; see also Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 522 (4th Cir. 2003) ("neither '[u]nsupported speculation,' nor evidence that is 'merely colorable' or 'not significantly probative,' will suffice to defeat a motion for summary judgment" (internal citations omitted)).

Alternatively, even presuming plaintiff could show "intentionality," he nevertheless fails to demonstrate the requisite "materiality" for a Franks violation because, were a corrected offense date of circa December 20, 2018, applied, this would establish probable cause for his arrest on charges of promoting prostitution as to Lisa and Ms. Justice. See Wharton, 840 F.3d at 169 ("In assessing materiality, we 'insert the facts recklessly [or intentionally] omitted, and then determine whether or not the corrected warrant affidavit would establish probable cause. If the corrected warrant affidavit establishes probable cause,' there is no Franks violation." (citation omitted)).

To the extent plaintiff instead alleges that Bass and Glorafield are liable for "false arrest" because the charges in the February 4, 2019, arrest warrants subsequently were dismissed as lacking probable cause for an offense date of November 25, 2018, this claim fails because, as noted above, these warrants were supported by probable cause, issued by a magistrate, and aside from the mistaken date of offense, otherwise "facially valid." See Baker v. McCollan, 443 U.S. 137, 143–44 (1979) (finding arrest pursuant to a facially valid warrant does not violate the constitution); Brooks, 85 F.3d at 183 (finding a claim sounds as malicious prosecution, not false arrest, when officers make an arrest pursuant to a facially valid warrant); see also Gay v. Wall, 761 F.2d 175,

24

177 (4th Cir. 1985) (citing Baker, 443 U.S. 137, for the proposition that "a mistaken arrest and detention pursuant to a facially valid warrant is not unconstitutional").

In sum, as to his February 4, 2019, arrest, plaintiff fails to demonstrate that he was seized pursuant to legal process unsupported by probable cause, see Humbert, 866 F.3d at 555, that Graham committed a Franks violation in obtaining the arrest warrants, see Evans, 703 F.3d at 650, or that Bass and Glorafield are liable for false arrest, see Brooks, 85 F.3d at 183.

The court now turns to plaintiff's claim that, during his February 4, 2019, arrest, Bass and Glorafield "illegally searched [his vehicle] without a search warrant and over his consent [sic]." Compl. Attach. [D.E. 1-1] at ¶9; see Mot. [D.E. 10] at 1–2; see also Pl.'s 2d Resp. [D.E. 98] at 2 (arguing, "the search that came from the arrest was unlawful" and, "if there is no probable cause for arrest, evidence obtained as a result of that arrest and any evidence resulting from the defendant having been placed in custody must be suppressed and is inadmissible in state and federal courts.").

Plaintiff now is incarcerated pursuant to a conviction for, *inter alia*, possession with intent to sell or deliver a Schedule II substance with a February 4, 2019, offense date. See McCormick, 289 N.C. App. 631, 888 S.E.2d 408 (2023); N.C. Dep't of Adult Corrections, Offender Pub. Info., https://webapps.doc.state.nc.us/opi/viewoffender.do?method=view&offenderID=0878635&searc hOffenderId=0878635&searchDOBRange=0&listurl=pagelistoffendersearchresults&listpage=1 (search by inmate number) (last visited Aug. 23, 2024) (listing, as the docket number, 19051622).

As noted above, Bass avers, *inter alia*, that: upon plaintiff's arrest on outstanding February 4, 2019, warrants, the arresting officers "located two bags of controlled substances in plain view on the passenger's seat"; two of these controlled substances field tested positive for cocaine base and heroin; on February 5, 2019, Bass presented probable cause to Magistrate Judge Peterson for

25

drug-related charges, and an arrest warrant issued; and Bass then served plaintiff with this arrest warrant. See Defs.' App., Ex. P, Bass Aff. [D.E. 88-16] at ¶¶4–8; see also id., Ex. F [D.E. 88-6] (Feb. 5, 2019, arrest warrant, in 19CR051622, charging plaintiff with: possession with intent to sell and deliver 2 grams of Heroin; possession with intent to manufacture, sell and deliver 1 gram total in multiple pieces of crack cocaine; and possession of one-half ounce of marijuana or less).

Because a finding that defendants' February 4, 2019, search of his vehicle violated the Fourth Amendment would require exclusion of the contraband discovered therein, see, e.g., Mapp v. Ohio, 367 U.S. 643, 655 (1961), and necessarily would demonstrate the invalidity of plaintiff's drug-related conviction, and because there is no showing that this conviction has been "reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal . . . or called into question by a federal court's issuance of a writ of habeas corpus," Heck, 512 U.S. at 486–87, this claim is Heck-barred, see Wilkinson v. Dotson, 544 U.S. 74, 81–82 (2005) (holding that, "a state prisoner's § 1983 action is barred (absent prior invalidation)—no matter the relief sought (damages or equitable relief), no matter the target of the prisoner's suit (state conduct leading to conviction or internal prison proceedings)—if success in that action would necessarily demonstrate the invalidity of confinement or its duration.").

Although plaintiff argues the State "violated § 15A-612(b) by using the same evidence to seek a new warrant in district court on 4-4-2019 after a finding of no probable cause," Pl.'s Mem. [D.E. 94-1] at 3; see Pl.'s 2d Resp. [D.E. 98] at 1, he is incorrect. The statute instead allows later prosecution of a defendant for the same offense regardless of the probable-cause hearing outcome. N.C. Gen. Stat. § 15A-612(b) ("No finding made by a judge in this section precludes the State from instituting a subsequent prosecution for the same offense."); see State v. Koberlein, 309 N.C.

26

601, 603, 308 S.E.2d 442, 444 (1983) (noting, in § 15A-612(b), the legislature "clearly expressed" an intent that "no finding made by a judge in a probable cause hearing will preclude the State from instituting a subsequent prosecution for the same offense"); State v. Cradle, 281 N.C. 198, 204, 188 S.E.2d 296, 301 (1972) ("In North Carolina, a preliminary hearing is simply an inquiry into whether the accused should be discharged or whether, on the other hand, there is probable cause to submit the State's evidence to the grand jury and seek a bill of indictment to the end that the accused may be placed upon trial.    The district judge . . . does not render a verdict; and a discharge of the accused is not an acquittal and does not bar a later indictment."); State v. Essick, 67 N.C. App. 697, 701, 314 S.E.2d 268, 271 (1984) ("While defendants urge that the dismissal of the charges upon a finding of no probable cause is the equivalent of an acquittal, it clearly is not."). Regardless, the court has found Heck-barred any § 1983 challenge to his promoting prostitution convictions with an offense date of December 20, 2018.    See Order [D.E. 37]; Order [D.E. 79].

To the extent that plaintiff instead seeks release from custody, he must seek such relief in a petition for a writ of *habeas corpus*, not in a § 1983 suit.    Preiser v. Rodriguez, 411 U.S. 475, 487–90 (1973); see Wilkinson, 544 U.S. at 81 (noting "the need to ensure that state prisoners use only habeas corpus (or similar state) remedies when they seek to invalidate the duration of their confinement—either directly through an injunction compelling speedier release or indirectly through a judicial determination that necessarily implies the unlawfulness of the State's custody.").

In sum, after viewing the evidence and the reasonable inferences drawn therefrom in the light most favorable to plaintiff, see Scott, 550 U.S. at 378, defendants have met their burden of showing the absence of a genuine issue of material fact as to plaintiff's Fourth Amendment claims, Celotex, 477 U.S. at 325, whereas plaintiff fails to "come forward with specific facts showing that

27

there is a genuine issue for trial," Matsushita, 475 U.S. at 587 (emphasis and quotation omitted), and defendants are entitled to summary judgment on these claims, see Anderson, 477 U.S. at 249.

Alternatively, as government officials, defendants are entitled to qualified immunity from civil damages when their "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). In other words, defendants are entitled to qualified immunity when (1) the plaintiff has not demonstrated a violation of a constitutional right, or (2) the court concludes that the right at issue was not clearly established at the time of the official's alleged misconduct. Pearson v. Callahan, 555 U.S. 223, 236 (2009). "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011) (alterations and quotations omitted).

Reasonable officials in defendants' position would not have recognized that their actions – seeking an arrest warrant for plaintiff with an incorrectly listed offense date and then arresting plaintiff under that issued warrant – violated plaintiff's clearly established rights. See id. at 743 ("When properly applied, [qualified immunity] protects 'all but the plainly incompetent or those who knowingly violate the law.'" (citation omitted)); Malley v. Briggs, 475 U.S. 335, 345 (1986) ("Only where the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable . . . will the shield of immunity be lost." (citing United States v. Leon, 468 U.S. 897, 923 (1984))); Franks, 438 U.S. at 171 (finding insufficient for a Fourth Amendment violation a warrant affiant's "negligence or innocent mistake"); United States v. Gary, 528 F.3d 324, 330 (4th Cir. 2008) (holding an "inadvertent, minor mistake" in a search warrant

28

affidavit is entitled to the "good-faith exception" (citing Leon, 468 U.S. at 913 (establishing the "good-faith" exception to exclusionary rule when "officers reasonably rely[ ] on a warrant issued by a detached and neutral magistrate"))), cert. denied, 555 U.S. 1123 (2009); Porterfield v. Lott, 156 F.3d 563, 568 (4th Cir. 1998) (finding deputies entitled to qualified immunity after arresting defendant on a facially valid warrant); Torchinsky v. Siwinski, 942 F.2d 257, 262 (4th Cir. 1991) ("When a police officer protects a suspect's rights by obtaining a warrant from a neutral magistrate, the officer should, in turn, receive some protection from suit under 42 U.S.C. § 1983. Otherwise, the threat of liability would force officers to continuously second-guess the considered decisions of magistrates. This in turn would promote delay in the execution of warrants, and alter the proper allocation of law enforcement functions. . . . In our view then, [the officer's] actions in seeking the arrest warrants and the magistrate's determination of probable cause provide additional support for [the officer's] claim that he acted with objective reasonableness." (citations omitted)); cf. Harris v. Town of S. Pines, No. 23-1791, 2024 WL 3643775, at *12 (4th Cir. Aug. 5, 2024) (reversing the district court's grant of summary judgment in a § 1983 case where officers "omitted material exculpatory evidence" and the record showed a genuine issue of material fact whether plaintiff was arrested and charged without probable cause). Thus, defendants are entitled to a finding of qualified immunity. See Malley, 475 U.S. at 341 ("The *Harlow* standard is specifically designed to . . . permit the resolution of many insubstantial claims on summary judgment . . . .'").

Finally, because defendants are entitled to summary judgment and dismissal of plaintiff's federal claims, after considering issues of judicial economy, convenience, fairness, and comity, see Shanaghan v. Cahill, 58 F.3d 106, 110 (4th Cir. 1995), the court declines to exercise supplemental jurisdiction over any of plaintiff's lingering state-law claims for, *inter alia*, malicious

29

prosecution, false arrest/imprisonment, and intentional infliction of emotional distress ("IIED").

See 28 U.S.C. § 1367(c)(3) (granting district courts discretion to decline to exercise supplemental jurisdiction over a pendent state-law claim where the court has dismissed all claims over which it has original jurisdiction); United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726 (1966) (noting "pendent jurisdiction is a doctrine of jurisdictional discretion" and that, "if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well"); Hinson v. Norwest Fin. S.C., Inc., 239 F.3d 611, 617 (4th Cir. 2001) (holding the district court possesses "inherent power to dismiss the case . . . provided the conditions set forth in § 1367(c) for declining to exercise supplemental jurisdiction have been met").

Conclusion:

In sum, the court: GRANTS IN PART plaintiff's motion seeking expedited resolution [D.E. 100], to the extent that the instant order satisfies this request; DENIES plaintiff's motion for reconsideration [D.E. 95]; DENIES AS MOOT plaintiff's motion for a copy of defendant's motion for summary judgment [D.E. 93]; GRANTS defendants' motion for summary judgment [D.E. 86]; DISMISSES WITHOUT PREJUDICE as Heck-barred claims regarding the February 4, 2019, vehicle search; DISMISSES the remaining federal claims; DISMISSES WITHOUT PREJUDICE any lingering state-law claims; DIRECTS the clerk to seal the following docket entries identifying a prostitution victim [D.E. 11, 29, 42, 43, 47, 49, 50, 56, 81-1, 85, 88-4, 88-8, 88-15, 94-4, 95-1], but to allow the parties access to these docket entries; and DIRECTS the clerk to close the case.

SO ORDERED this 27th day of August, 2024.

RICHARD E. MYERS II<br/>
Chief United States District Judge

30